**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TIMOTHY MILLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. 07 CV 2317** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Jeffrey Cole** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Timothy Miller seeks review of the final decision of the Commissioner of the Social Security Administration denying his application for both Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 423, 1382C. Mr. Miller asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision denying Mr. Miller's application. For the reasons set forth below, Mr. Miller's motion is granted.

### I. PROCEDURAL HISTORY

Mr. Miller filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments on October 26, 2004, alleging an onset date of February 19, 2004. (Administrative Record ("R.") at 32). Mr. Miller's applications were denied both initially and on reconsideration. (R. 34, 42). He then requested a hearing before an Administrative Law Judge (R. 46), which was held on August 3, 2006. (R. 257). Following the hearing, the ALJ issued an unfavorable decision, dated September 15, 2006, denying Mr. Miller's applications for

DIB and SSI. (R. 16-24). Mr. Miller filed a timely request for review, and was denied by the Appeals Council on March 20, 2007, leaving the ALJ's decision as the final decision of the Commissioner. *See* 20 C.F.R. §§ 416.1455, 416.1481. As authorized by 42 U.S.C. § 405(g), Mr. Miller appealed the final decision of the Commissioner to the District Court. The parties have consented to jurisdiction here pursuant to 28 U.S.C. § 636(c).

## II. EVIDENCE OF RECORD

### A. Plaintiff's Testimony

Mr. Miller was born on October 6, 1961, making him 44 at the time of the ALJ's decision. (R. 260). He has a twelfth-grade education. *Id.* Mr. Miller is single with one 25-year-old child. (R. 263). He resides in Maywood, Illinois in a house with his mother and nephew. (R. 262). Dr. Perry is Mr. Miller's treating physician and has been treating him for ten years. (R. 267). Since October of 2004, Mr. Miller sees Dr. Perry approximately every three to four months. *Id.*

Mr. Miller alleges an onset date of February 19, 2004. (R. 263). Mr. Miller contends that he stopped working due to a back injury, acid reflux, arthritis and diabetes. (R. 266). He testified that he was most recently employed as a forklift operator between July 2004 and September 2004. (R. 263-64). As a forklift operator, he lifted no more than 10 pounds. (R. 77). Prior to February of 2004, Mr. Miller worked for approximately six months as a delivery man. (R. 264). He delivered payroll and small parcels to different companies, lifting no more than ten pounds. (R. 78, 265). Prior to his delivery position, he worked for four years as a forklift operator. (R. 265). At this position, he did manual lifting of various items weighing up to 70 pounds. *Id.*

Mr. Miller testified that a benign tumor in his jaw was first discovered in October of 2004. (R. 266). He explained that he had his first jaw surgery in December of 2004. *Id.* The original surgical repair in his jaw broke and he underwent a second surgery in February of 2005.[1] In order to replace and reconstruct the jaw bone, bone was taken from both of his hips and placed in his jaw, along with a plate and a hinge. (R. 266-67). Mr. Miller experiences pain in his jaw as a result of the jaw reconstruction surgeries and on occasion his jaw will lock or his throat will close up, leaving him temporarily unable to talk. (R. 274).

Mr. Miller testified that he has diabetes, which is controlled through oral medication, rather than insulin. (R. 268). Mr. Miller also takes oral medication for hypertension and gastroesophageal reflux disease ("GERD").[2] (R. 269). Mr. Miller testified that Dr. Perry told him he had an enlarged heart and a leaking kidney. (R. 270). At the time of the hearing, Mr. Miller had an appointment scheduled with a mental health physician to explore the possibility of receiving treatment for depression. (R. 272).

Mr. Miller experiences fatigue, dizziness and nausea due to diabetes and GERD and does not have much energy. (R. 272). Due to GERD, he uses the bathroom more often than usual and suffers from sporadic diarrhea. (R. 272-73). Mr. Miller considers the diarrhea his most debilitating problem and claims that it has caused him to lose previous jobs. (R. 276).

Mr. Miller testified that he has osteoarthritis in all of his joints. (R. 273). He contended that his doctors told him he had arthritis and that x-rays were taken in order to initially diagnosis

---

[1] Mr. Miller's testimony as to when he had his two jaw surgeries is in conflict with medical records. However, it appears he simply reversed the months and years for each surgery.

[2] GERD is a condition in which acid from the stomach flows up into the esophagus. Heartburn is the most common symptom. *American Medical Association Complete Medical Encyclopedia*, 525 (Jerrold B. Leikin & Martin S. Lipsky, eds. 2003).

his condition as such. (R. 273, 278). However, at the time of the hearing, the x-rays were not a part of the record. (R. 278-79).

As a result of the arthritis, he experiences constant joint pain. *Id.* His knee pain is often so severe that he has to take four ibuprofen. (R. 274). Mr. Miller testified that it is difficult for him to lift any amount of weight without experiencing pain. (R. 274-75). He has a hard time twisting open lids and cannot carry a gallon of milk without pain. (R. 275). Mr. Miller has trouble walking and testified that he could walk only a half of a block without experiencing pain. *Id.* He has trouble sitting due to pain in his back, knees and hips. *Id.* He contends that on some days he might have trouble getting to work due to the arthritis and GERD. (R. 276-77).

## B. Medical Evidence

Medical records indicate that Mr. Miller is 70.75 inches tall, and his weight fluctuates between 260 and 285 pounds. (R. 131, 155, 162, 174). The record of treatment notes from Stroger Hospital indicates various diagnoses of medical conditions, including diabetes mellitus, GERD with persistent burning, hypertension, and high cholesterol. (R. 88, 166-67). Dr. Perry also noted a possible diagnosis of gout/arthritis. (R. 88). Mr. Miller's medications included Glipizide and Metformin for diabetes, Enalapril for high blood pressure, Ranitidine for heartburn and acid indigestion, Lovastatin for high cholesterol, and Ibuprofen for joint pain. *Id.*

Medical records show that Mr. Miller had surgery for removal of an ameloblastoma[3] in the right mandible in February of 2004. (R. 97-118). The records further indicate that Mr. Miller had a second surgery in December of 2005 for a posterior hip graft to reconstruct the right mandible, due to a right-sided mandibular defect. (R. 169).

---

[3] Ameloblastoma is a rare disorder of the jaw involving abnormal tissue growth. The resulting tumors are usually benign. *Dorland's Illustrated Medical Dictionary,* 58 (2000); WebMD, http://www.webmd.com/cancer/ameloblastoma (last visited Feb. 12, 2008).

4

Dr. Dean Thomas Velis performed a consultative exam at the Administration's request on March 21, 2005. (R. 130). Dr. Velis described Mr. Miller as an "overweight male." (R. 131). Dr. Velis diagnosed diabetes, GERD, degenerative joint disease with range of motion pain in all joints, and status-post resection of benign tumor in the right mandible with internal hardware placed and a reconstruction scheduled. (R. 132-33). Dr. Velis noted that Mr. Miller complained of chronic and persistent pain due to GERD and of pain and fatigue during mastication. *Id.* The doctor said that Mr. Miller demonstrated full ranges of motion, normal unassisted gait, full ability to grasp and manipulate with both hands, and had no muscle spasms or sensory deficits (R. 130-133). A straight leg test was negative in both legs. (R. 132). Based on Dr. Velis's consultative exam findings, a physical residual functional capacity assessment was completed, in which an agency medical consultant asserted that Mr. Miller could lift 50 pounds occasionally and could stand, walk or sit for about six hours each day. (R. 135). Significantly, Dr. Velis did not examine Mr. Miller after the surgery on his hips to remove bone to be used to reconstruct Mr. Miller's jaw in December 2005.

Following Mr. Miller's second jaw surgery in December of 2005, Dr. Perry, Mr. Miller's treating physician, completed a residual functional capacity assessment. (R. 232-38). Dr. Perry diagnosed osteoarthritis of the back, knee, and hand, cardiomegaly, hyperlipidemia, proteinuria, right jaw ameloloblastoma, hypertension and diabetes mellitus. (R. 232, 237). He noted back and hip pain secondary to the second jaw surgery, in which bone was extracted from the hip. (R. 232). He indicated signs of muscle spasms, tenderness and a positive straight leg test on the right leg. *Id.* Dr. Perry noted that emotional factors contributed to the severity of Mr. Miller's symptoms and functional limitations and indicated depression as a psychological condition affecting pain. (R. 232-33). Possible side effects of Mr. Miller's prescribed medication included

5

fatigue, stomach aches and dizziness. (R. 233). Mr. Miller's diabetes also lead to dizziness, as well as nausea. (R. 234).

As a result of Mr. Miller's impairments, Dr. Perry indicated that Mr. Miller could walk less than one city block without rest or severe pain, sit continuously for five minutes and stand continuously for five minutes. (R. 233-34). In an 8-hour work day, Dr. Perry indicated that Mr. Miller could sit, stand or walk for less than two hours. (R. 234). Dr. Perry further noted that Mr. Miller required a job that allows him to shift positions at will and take unscheduled breaks. *Id.* Dr. Perry contended that Mr. Miller has significant limitations in doing repetitive reaching, handling or fingering and has problems lifting a bag of groceries and twisting off lids. (R. 235-36). According to Dr. Perry, Mr. Miller's impairments are likely to produce "bad days" and would cause him to be absent more than four days a month from work. (R. 236).

The X-rays mentioned at the administrative hearing were eventually submitted as a part of Mr. Miller's medical record. (R. 239). June 2006 x-ray reports of the feet revealed moderate right flatfoot[4] with a "probably associated talar exostosis" – essentially a bony formation in the ankle joint – and mild left flatfoot with mild narrowing of joints. (R. 240). Bone density was noted as normal and there were no joint erosions. (R. 240). X-ray reports of the knees indicated a small bony extension on the right knee and no joint erosions. (R. 241). An x-ray report of the hands revealed a slight narrowing of joint space. (R. 242). There was no definitive evidence to suggest rheumatoid arthritis in the knees or hands. (R. 241-42).

---

[4] Flatfoot is a condition in which one ore more of the arches of the fooot have been lowered and flattened out. *Dorland's Illustrated Medical Dictionary*, 684 (2000). Flatfoot can be inherited, caused by an injury or a condition, such as arthritis or diabetes. WebMD, http://www.webmd.com/a-to-z-guides/flatfoot-pes-planus-topic-overview (last visited Feb 12, 2008).

### III. THE ALJ'S DECISION

The ALJ found that Mr. Miller had not engaged in substantial gainful activity since his alleged onset date of February 19, 2004. (R. 21). As to Mr. Miller's severe impairments, the ALJ determined that Mr. Miller had "medically determinable severe status post resection of a benign right mandible tumor and follow up bilateral iliac crest bone graph, along with controlled diabetes mellitus and hypertension." *Id.*

The ALJ evaluated the evidence of record to determine Mr. Miller's residual functional capacity. *Id.* In evaluating the evidence, the ALJ first discussed the medical opinion of the Administration's physician, Dr. Velis, who examined Mr. Miller in March of 2005. *Id.* The ALJ noted the statements made by Dr. Velis as to Mr. Miller's full range of motion, unassisted gait and history of jaw resection. *Id.* He commented on the notes taken by Dr. Velis indicating Mr. Miller's complaints of pain during chewing, problems related to GERD and degenerative joint disease with range of motion pain in all joints. (R. 21-22).

The ALJ discussed the June 2006 x-ray reports and their results. (R. 22). He stated that the x-rays disclosed normal bone density without joint erosion in the feet, no erosion in the knees and no signs of rheumatoid arthritis in either the knees or the hands. *Id.* Joint space in the hands was intact with no erosion. *Id.* The ALJ did not mention the notations in the x-ray reports of flatfoot or the narrowing of joint space in the hands and feet. (R. 240-42).

As to the credibility of the claimant, the ALJ found that Mr. Miller's "testimony concerning pain and functional limitations was inconsistent with and unsupported by objective, clinical findings and other evidence of record considered as a whole." (R. 24). He did not find the testimony convincing enough to further lower Mr. Miller's residual functioning capacity. (R. 22). The ALJ contended that Dr. Perry's notes disclosed controlled diabetes and hypertension

without complaints of dizziness or fatigue, and contained no indications of complaints of diarrhea associated with GERD. *Id.* X-ray reports did not establish the presence of rheumatoid arthritis and Dr. Velis' physical exam did not disclose arthritic type limitations. *Id.* The ALJ did note that Dr. Perry assessed gout and prescribed medication accordingly. *Id.*

The ALJ gave the opinion of the treating physician, Dr. Perry, "little weight," finding that his opinions and diagnoses in the arthritis questionnaire were not supported by objective-clinical findings or observations contained in his office notes. (R. 23). The ALJ found no evidence to warrant Dr. Perry's opinion that Mr. Miller could sit and stand for only five minutes at a time and could do no lifting. *Id.* The ALJ opined that the limitations noted in the arthritis questionnaire are simply Mr. Miller's subjective complaints and are not otherwise supported by medical evidence. *Id.* He accorded Dr. Velis's opinions more weight.

Based on his finding that Mr. Miller has the residual functional capacity to perform medium work, and Mr. Miller's testimony as to his past employment as a delivery person, the ALJ concluded that Mr. Miller could perform his past relevant work and a finding of "not disabled" was entered. (R. 24).

## IV. DISCUSSION

### A. Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. A reviewing court must affirm the Commissioner's decision if it is supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Collins v. Astrue*, 2009 WL 1247188, at *3 (7th Cir. 2009); *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). The court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the

Commissioner. *Id.* Rather, where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the duty of resolving this conflict lies solely with the Commissioner. *Id.* However, where the Commissioner commits an error of law, deference is inappropriate, and the Court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Id.*

While the standard of review is deferential, deference is not obeisance, *Rogers v. Barnhart*, 446 F. Supp. 2d 828, 833 (N.D. Ill. 2006), and a reviewing court must not serve as a mere "rubber stamp" for the Commissioner. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). For the court to affirm a denial of benefits, the ALJ must have "articulated" the reasons for his decision at "some minimum level." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Thus, the ALJ "must build an accurate and logical bridge from the evidence to the conclusion." *Id.* [5] *See also Collins, supra,* 2009 WL 1247188 at *3.

Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence which supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and, most importantly, afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595. The court must remand the case where the Commissioner's decision lacks

---

[5] The requirement that ALJs must explain the reasoning that led to a particular conclusion is neither unique to ALJs nor does it impose some heightened obligation on them. The principle governs decision-making at all levels of the federal judiciary as well. *See, e.g., United States v. Elliott*, 467 F.3d 688, 690 (7th Cir.2006); *Szmaj v. AT & T*, 291 F.3d 955, 956 (7th Cir.2002) (Posner, J.) (Referring to a particular case as weak authority "because there is no discussion of the point, only a conclusion."); *United States v. Eiselt*, 988 F.2d 677, 680 (7th Cir.1993) ("'Reasons' means something more than conclusions-a distinction important not only to the defendant ... but also to the appellate process."). *Cf. Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951) (Frankfurter, J., concurring) (the validity and moral authority of any conclusion largely depends on the mode by which it was reached); Henry M. Hart, Jr., *Foreword: The Time Chart Of The Justices*, 73 Harv.L.Rev. 84, 98-99 (1959) ("In the end, however, ipse dixits are futile as instruments for the exercise of 'the judicial Power of the United States.'").

evidentiary support or is so poorly articulated as to prevent meaningful review. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003).

## B. Five-Step Sequential Analysis

The Social Security Regulations set forth a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently employed:

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy.

20 C.F.R. § 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, during steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. § 416.1520; *Briscoe*, 425 F.3d at 351-52. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. § 404.1520. The plaintiff bears the burden of proof through step 4, after which, at step 5, the burden shifts to the Commissioner. *Briscoe*, 425 F.3d at 352.

### The ALJ Failed To Consider Certain Of Mr. Miller's Impairments

Mr. Miller argues that the ALJ failed to consider his arthritis, obesity, cardiomegaly and hip pain singly, or in combination with his other impairments contrary to Social Security Ruling 96-8p and Social Security Ruling 02-1p.[6] SSR 96-8p provides guidance for determining the

---

[6] Social Security Rulings ("SSR") are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law, they are binding on all components of the Social (continued...)

Residual Functional Capacity ("RFC") of the claimant and directs the adjudicator to base the RFC determination on "*all* of the relevant evidence in the case record." 1996 WL 375184, 5 (S.S.A.).

In assessing RFC, SSR 96-8 guides the ALJ to consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." SSR-96-8 at 5. While a "not severe" impairment standing alone may not significantly limit an individual's ability to work, it may - when considered with other limitations or restrictions - be critical to the outcome of a claim. *Id.* Furthermore, "careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." *Id.*

The ALJ must take into consideration all of the *relevant* evidence of record before making his decision. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). While the ALJ is not required to discuss every piece of evidence in the record, he cannot elect only to discuss the evidence favorable to his ultimate conclusion. *Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir. 2001). Thus, the ALJ may not ignore an entire line of evidence that is contrary to his findings and must articulate at some minimal level his analysis of the evidence in order to permit an informed review. *Id.*

### Mr. Miller's Arthritis

The ALJ briefly mentioned Dr. Perry's diagnosis of osteoarthritis of the back and knee on the Arthritis Residual Functioning Capacity Questionnaire. The ALJ said that he afforded the opinion of Dr. Perry "little weight" because it was not supported by medical evidence. But there

[6](...continued)
Security Administration. *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999); 20 C.F.R. § 402.35(b)(1). SSR 02-1p pertains to obesity and is discussed in detail below.

was a great deal of evidence in the record that Mr. Miller suffered from osteoarthritis. For example, there was Dr. Velis's indication of degenerative joint disease, which is another name for osteoarthritis. *American Medical Association Complete Medical Encyclopedia*, 441 (Jerrold B. Leikin & Martin S. Lipsky, eds. 2003). Dr. Velis had indicated Mr. Miller experienced range of motion pain in all joints. (R. 232) Mr. Miller testified as to the pain he experiences when sitting, standing or walking (R. 275).

The ALJ also ignored the portions of the June 2006 x-ray reports which mention flatfoot in both feet and narrowing of the joints. (AR. 240). The ALJ's articulation of his analysis primarily involves only that evidence which supports his ultimate conclusion, rather than a properly articulated description of all of the evidence accompanied by an analysis of how the evidence was weighed. *See Zurawski*, 245 F.3d at 888-89 (finding reversible error where ALJ considered only evidence favoring his conclusion and ignoring that which did not). Thus, the ALJ erred when failing to consider Dr. Perry's diagnosis of arthritis.

The ALJ's most significant error was that he totally ignored the bilateral ilium graft surgery Mr. Miller underwent in December of 2005 to enable doctors to reconstruct Mr. Miller's jaw following surgery to remove a tumor in the right mandible. (R. 169, 266-67). Indeed, in determining Mr. Miller's residual function capacity, the ALJ looked only to the medical evidence as it existed *prior* to that surgery which removed bone from both Mr. Miller's hips. And yet, that surgery would appear to have an obvious effect on Mr. Miller's ability to walk, sit, and engage in productive work. Such surgery is known to cause considerable pain. www.nchi.nlm.nih.gov. Dr. Perry indicated as much. The removal of bone from both Mr. Miller's hips certainly supported Mr. Miller's claims of pain – claims which the ALJ found not credible and unsupported by objective medical evidence.

In finding that there was no evidence to warrant Dr. Perry's opinion that Mr. Miller could sit and stand for only five minutes at a time and could do no lifting, the ALJ opined that the limitations noted in the arthritis questionnaire are simply Mr. Miller's subjective complaints and are not otherwise supported by medical evidence. (R. 23). As in *Collins*, the ALJ failed to explain why Dr. Perry's post-surgery evaluation of Mr. Miller was not justified in light of the changed circumstances stemming from the December 2005 operation. There was ample evidence that Mr. Miller had osteoarthritis, and the operation could have exacerbated the "progressive deterioration of [Miller's] degenerative condition." *Collins,* 2009 WL 1247188 at *4. The problem is that the ALJ simply ignored that operation in his assessment of the medical evidence and the credibility of Mr. Miller and Dr. Perry.

### Obesity

Mr. Miller contends that the ALJ failed to consider the impact of obesity on his other impairments when evaluating his residual functional capacity, contrary to Social Security Ruling 02-1P. Due to its debilitating symptoms, the combined effects of obesity and other impairments can be greater than the effects of each of the impairments alone. SSR 02-1P, 2000 WL 628049, 6 (S.S.A.). SSR 02-1P specifically offers an example of when obesity can have a much greater effect in combination with other impairments noting that "someone with obesity and arthritis affecting a weight bearing joint may have more pain and limitation than might be expected from the arthritis alone."

The Commissioner contends that because there was no medical diagnosis of Mr. Miller's obesity, the ALJ did not err when it failed to take obesity into account when evaluating residual functional capacity. However, SSR 02-1P is clear in stating that a medical diagnosis of obesity is not required. *Id.* at 3. The adjudicator may rely on his judgment and medical evidence of

weight and height to establish the presence of obesity, even where a treating or examining source has not indicated a diagnosis of obesity. *Id.* As long as the weight or BMI of the individual shows a consistent pattern of obesity, a diagnosis of obesity can be presumed. *Id.*

Medical records indicate that Mr. Miller is 70.75 inches tall, with his weight fluctuating between 260-283 pounds. (R. 131, 155, 162, 174). A simple calculation using the BMI results in a BMI of 39.5, classifying Mr, Miller as having Level II obesity. More specifically, even Dr. Velis described Mr. Miller as "overweight." (R. 131). Although Dr. Velis' remark falls short of a diagnosis of obesity, when paired with Mr. Miller's weight, height and BMI, a conclusion can easily be deduced that obesity may be a relevant factor in evaluating Mr. Miller's residual functional capacity.

In *Clifford v. Apfel*, the Seventh Circuit criticized the ALJ for ignoring a severe case of obesity that, like here, was not specifically diagnosed, but was clear from the medical records. 227 F.3d 863, 873 (7th Cir. 2000). When obesity aggravates a disability caused by something else, it still must be considered for its incremental effect on the disability. *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). By failing to consider Mr. Miller's obesity, the ALJ mistakenly overlooked a condition that could significantly impact Mr. Miller's other impairments, such as the osteoarthritis that the medical records showed he was suffering from. It could also affect – indeed it is one of the contributing factors toward -- diabetes, and high blood pressure. Thus, the ALJ erred when he failed to consider Mr. Miller's obesity.

### Cardiomegaly

In the Arthritis Residual Functional Capacity Questionnaire, Dr. Perry diagnosed cardiomegaly, or an enlarged heart, which is often the result of high blood pressure. This is the first mention of cardiomegaly, and although Mr. Miller testified that his doctor told him he had

an enlarged heart (R. 270), there is no further medical evidence from Dr. Perry's treatment records or Dr. Velis' assessment to indicate the presence of an enlarged heart. The plaintiff has not asserted any limitations relating to the diagnosis of cardiomegaly either in his testimony or his brief. Thus, the ALJ did not err when he did not consider the diagnosis in his opinion as it did not result in any further limitations, which could affect the determination of Mr. Miller's residual functional capacity.

### Hip Pain

Dr. Perry also indicated that Mr. Miller experienced hip pain as a result of the bone that was removed from both hips in order to reconstruct Mr. Miller's jaw following the removal of a mandibular tumor. (R. 232). Dr. Perry was the only physician to examine Mr. Miller following the second surgery in December 2005 and, thus, his finding of hip pain is not inconsistent with the other medical evidence in the case. Dr. Velis, by contrast, examined Mr. Miller in March of 2005 before the surgery. (R. 169). Resulting hip pain is consistent with such a procedure, and thus is supportive of Mr. Miller's testimony regarding the pain he experiences when he sits, stands or walks for more than a short period of time. (R. 275).

Inexplicably, the ALJ makes no mention in his opinion of Mr. Miller's hip pain and seems to ignore the obvious in failing to recognize that the hip pain could well be a concomitant of that surgery. That pain is relevant to the question of Mr. Miller's functional capacity. The ALJ's failure to at least minimally articulate his reasons for rejecting this evidence is reversible error. *See Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000), *citing Herron,* 19 F.3d at 333 (noting that the ALJ cannot, without adequate explanation, discount an uncontradicted, dispositive medical opinion).

15

## The ALJ's Credibility Determination

Mr. Miller contends that the ALJ failed to properly assess his credibility, contrary to Social Security Ruling 96-7p, which the Seventh Circuit has held must be complied with. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). A reviewing court must afford an ALJ's credibility finding "considerable deference" and may not overturn it unless it is "patently wrong." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). Such deference is appropriate as the reviewing court lacks the opportunity to observe the testimony of the claimant. *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). Thus, "only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported ... can the finding be reversed." *Id.*

When evaluating the credibility of the claimant's testimony, the ALJ must examine the entire case record and assess the evidence favoring the claimant, as well as that favoring the Commissioner. SSR 96-7P, 1996 WL 374186 (S.S.A.). While the ALJ is not required to discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it is rejected. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). A credibility finding cannot be based on a mere "intangible or intuitive notion" about an individual. SSR 96-7P at 4. Also, nothing in SSR 96-7p suggests that the reasons for a credibility finding may be implied. *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003).

Rather, the case law is clear in requiring the ALJ to specify the reasons for his credibility findings. Thus, it is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that the "allegations are (or are not) credible." SSR 96-7p at 4; *Zurawski*, 245 F.3d at 887.

16

In dismissing Mr. Miller's testimony, the ALJ claimed that the "testimony concerning pain and functional limitations was inconsistent with and unsupported by objective findings and other evidence of record considered as a whole." (R. 22). He did not find the testimony "convincing" enough to further reduce the residual functional capacity. (R. 24). This sort of *ipse dixit* does not comport with the ALJ's obligation to fully explain the basis for the conclusion and the reasoning which led him to it. The test of credibility is not a matter of "convincing," but involves a careful assessment of whether the testimony is consistent with the record as a whole. By failing to set forth specific reasons for rejecting the testimony of Mr. Miller and examining only the evidence that he believed supported his final conclusion, the ALJ did that which is explicitly condemned by SSR 96-7p.

At the administrative hearing, Mr. Miller testified as to chronic hip, back, and knee pain, fatigue, dizziness, nausea, diarrhea, and difficulty walking, standing and sitting for prolonged periods of time. (R. 259-279). In rejecting the testimony of Mr. Miller, the ALJ relied heavily on the opinion of Dr. Velis and the June 2006 x-ray reports. However, both Dr. Velis and the x-ray reports did offer support for Mr. Miller's testimony; support which the ALJ failed to even consider. For example, Dr. Velis explicitly noted degenerative joint disease with range of motion pain in all joints in his evaluation of Mr. Miller's condition. (R. 133). The x-ray reports also indicated mild flatfoot in both feet and narrowing of the joints in the hands and knees, which the ALJ failed even to mention. (R. 240-242). Beyond that, Dr. Velis's examination was prior to the removal of bone from Mr. Miller's hips, which would add further support for his complaints of severe pain and would also buttress Dr. Perry's conclusions.

Dr. Perry's medical records also provide support for Mr. Miller's testimony. On several occasions, he noted Mr. Miller's complaints of nausea and dizziness, as well as the possibility of

gout, a type of arthritis that could lead to the types of pain described by Mr. Miller in his testimony. (R. 233, 88). In failing to fully explain his rationale or examine the record as a whole, the ALJ failed to provide a proper analysis to accompany his credibility determination and, thus, reversal is required.

Finally, in concluding that Mr. Miller's testimony relating to hip, back and knee pain was inconsistent with the objective medical evidence, the ALJ ignored the 2005 surgery which removed bone from both of Mr. Miller's hips. That surgery supports Mr. Miller's claims of pain. Perhaps on further inquiry, the claims may be found inadequate to warrant a grant of benefits. But they may not be casually tossed aside or overlooked. In short, there is ample evidence both prior to the December 2005 hip surgeries to support Mr. Miller's claims of pain and to require rejection of the ALJ's conclusion that Mr. Miller's claim were otherwise unsupported.

Pain can be severely disabling without an identifiable medical cause. *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006). In *Johnson*, the court took issue with the ALJ for disbelieving the pain related testimony of the claimant, indicating that pain is not so easily understood as to be simply "read off" from a medical report. *Id.* However, an ALJ may disregard testimony relating to pain where the claimant's daily activities are inconsistent with the pain he claims to experience or where the claimant has not been actively seeking or receiving treatment for the impairments which cause the pain. *Id.* at 806-807. In those two instances, the objective actions of the claimant indicate that his subjective description of pain may in fact be an exaggeration.

Here, where objective medical evidence does in fact support Mr. Miller's complaints of pain, and where Mr. Miller has been actively seeking treatment and is not engaging in daily

activities inconsistent with his pain, the ALJ appears to have simply "read off" Mr. Miller's

testimony in regard to pain, thus committing reversible error.

## The ALJ's Rejection Of Mr. Miller's Treating Physician's Opinion

Mr. Miller further contends that the ALJ improperly evaluated the opinion of his treating

physician by giving his opinion "little weight," contrary to the Social Security regulations. The

ALJ rejected the opinion of Dr. Perry contending it was unsupported by objective clinical

findings or office notes. (R. 23). The ALJ appears to have given the controlling weight to Dr.

Velis, the Administration physician who conducted a consultative exam at the Administration's

behest, but before Mr. Miller's surgery to remove bone from both his hips in December 2005.

The so-called treating physician rule was recently explored by the Seventh Circuit in

*Collins v. Astrue*. There, the applicant for disability insurance benefits and supplemental security

income, an obese diabetic with severe degenerative arthritis in her knees, claimed that she was

unable to work primarily because of pain associated with her arthritis. The ALJ discounted the

opinion of Ms. Collins' treating physician and found that she was capable of performing

sedentary work and denied her application for benefits. The court's opinion is instructive here:

> The ALJ failed to provide 'good reasons that were 'sufficiently specific to make
> clear to any subsequent reviewers the weight the adjudicator gave to the treating
> source's medical opinion and the reasons for that weight.' *See* 20 C.F.R. §
> 404.1527(d); *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir.2004)
> (quoting S.S.R. 96-2p,1996 WL 374188, at *5 (1996)). Specifically, the
> administrative regulations instruct an ALJ when determining how much weight to
> give a treating physician's opinion to consider the length, nature, and extent of the
> physician-applicant relationship, whether the physician is a specialist in the
> applicant's condition, the degree of consistency between the opinion and other
> evidence in the record, and the extent to which the physician supported his opinion
> with medical findings. 20 C.F.R. § 404.1527(d); *Elder v. Astrue,* 529 F.3d 408,
> 415 (7th Cir.2008). The ALJ did not apply these regulations. In deciding to not
> give "any significant weight" to Dr. Olson's opinion, he made no mention of the
> nature of Dr. Olson's relationship with Collins (Dr. Olson had evaluated Collins at

least fifteen times over three years) or the fact that Dr. Olson was an orthopedic specialist. *See* 20 C.F.R. § 404.1527(d).

*Collins,* 2009 WL 1247188 at *4.[7]  *See also Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir. 2008); *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007).

There is no indication that the ALJ considered the factors set forth in the regulations when determining what weight to accord Dr. Perry's opinions.  The ALJ simply stated that his opinions in the arthritis questionnaire were not supported by his objective clinical findings or office notes. (R. 23).  There is no mention of length of treatment or the nature and extent of the treatment.  Dr. Perry is a family practitioner who has been treating Mr. Miller for over ten years.  (R. 267).  For the past three years, Mr. Miller has seen Dr. Perry every three to four months.  *Id.*  This lengthy and consistent doctor/patient relationship was entirely disregarded by the ALJ when he decided to accord Dr. Perry's opinion little weight and accord the opinion of Dr. Velis, who examined Mr. Miller on one occasion – and that before the significant surgery in December 2005 – a great deal of weight.

The social security regulations also advise the ALJ to consider the consistency of the treating   physician's opinion with the record *as a whole*.  20 C.F.R. §§ 404.1527(d)(2), (4) (Emphasis added).  Here, not only did the ALJ fail to examine the record as a whole, but he focused solely on the supposed inconsistencies in Dr. Perry's opinion, without discussing or even recognizing obvious consistencies with the record.

Dr. Perry's opinion as to the functional capacity of Mr. Miller is supported by his own treatment notes, as well as the medical examination of Dr. Velis and Mr. Miller's testimony.  Of

---

[7] Of course, a claimant is not entitled to benefits merely because the treating physician says so. *Ziegler Coal Co. v. Office of Workers' Comp. Programs,* 490 F.3d 609, 616 (7th Cir. 2007)*; Dixon v. Massanari,* 270 F.3d 1171, 1177 (7th Cir. 2001).

course, once Mr. Miller's testimony was rejected, it laid the groundwork for Dr. Velis's opinions to carry the day. But as discussed, that rejection was improper and thus it cannot be the basis to bootstrap a rejection of Dr. Perry's opinions. Ignored was the fact that Dr. Perry specifically mentioned the possibility of gout, a type of arthritis, in his treatment notes. (R. 88). More importantly, Dr. Velis noted degenerative joint disease, another name for osteoarthritis with range of motion pain in all joints, in the clinical impressions portion of his assessment of Mr. Miller. That is consistent with the observations of Dr. Perry as to Mr. Miller's joints and pain. (R. 133). Mr. Miller also testified as to the pain he experiences when standing, sitting or walking for long periods of time, obviously consistent with the opinion of Dr. Perry in the arthritis questionnaire.

The ALJ appears to have relied heavily on the June 2006 x-ray reports, which note the absence of definitive evidence of *rheumatoid* arthritis in the hands or knees. (R. 241-42). It is curious that the ALJ found these reports supportive of his rejection of Mr. Miller's credibility and Dr. Perry's evaluation. In the Arthritis Residual Functional Capacity Questionnaire, Dr. Perry diagnosed *osteoarthritis*, which is a dramatically different form of arthritis and thus, there is no inconsistency between his diagnosis and the absence of evidence of rheumatoid arthritis.

Osteoarthritis, also called degenerative joint disease, is a condition caused by wear and tear on the joints accompanied by an erosion of articular cartilage. Rheumatoid arthritis is a more serious systemic form of arthritis which causes a gradual and chronic inflammation of the thin membrane lining the joints. *American Medical Association Complete Medical Encyclopedia*, 927, 1077 (Jerrold B. Leikin & Martin S. Lipsky, eds. 2003). The Merck Manual defines rheumatoid arthritis as a chronic, systemic autoimmune disease, which affects only about one percent of the population. By contrast, osteoarthritis is a chronic arthropathy characterized by disruption and potential loss of joint

cartilage along with other joint changes. It is the most common joint disorder. *See Merck Manual,* http://www.merck.com/mmpe/sec04/ch034/ch034b.html; http://www.merck.com/mmpe /sec04/ch034/ch034e.html?qt=osteoarthritis&alt=sh#.

The diagnosis of osteoarthritis is consistent with Mr. Miller's complaints of pain, the notes of Dr. Velis and the fact that the x-rays did show some abnormalities in the feet, knees and hands. Furthermore, in the past, Dr. Perry did indicate the possible presence of gout, another form of arthritis. In sum, Dr. Perry's opinion is consistent with the other evidence in the case, especially that of Dr. Velis, whose opinion is accorded controlling weight by the ALJ. Finally, only Dr. Perry examined Mr. Miller after his December 2005 bone grafts. It is anomalous at best for the ALJ to have given controlling weight to the testimony of a doctor who examined Mr. Miller on one occasion prior to that significant surgery, while according virtually no weight to a physician who did examine him after the surgery and who had been his treating physician for a decade. Perhaps, in the end, that selection was the right one. But on the present record, there is not enough to support the ALJ's determination.

## CONCLUSION

The plaintiff's Motion for Summary Judgment [16] is GRANTED and the Defendant's Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment [21] is DENIED. This case is remanded to the Commissioner for further proceedings consistent with this opinion.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 6/4/09